

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-17-00159-CR

ASHLEY EVA MORRISON, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 6th District Court
Lamar County, Texas
Trial Court No. 26166

Before Morriss, C.J., Burgess and Moseley,* JJ.
Opinion by Justice Burgess

*Bailey C. Moseley, Justice Retired, Sitting by Assignment

## O P I N I O N

### I.     Introduction

This case involves two principles of law.  First, "[t]he Sixth Amendment . . . imposes on the State an affirmative obligation to respect and preserve the accused's choice to seek assistance," which means, "at the very least, the prosecutor . . . [has] an affirmative obligation not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel." *Maine v. Moulton*, 474 U.S. 159, 170–71 (1985).  Because billing records exist to secure an indigent defendant's right to the appointment of counsel, the prosecutor's "affirmative obligation" requires a prosecuting attorney to refrain from reviewing indigent defense billing records during the case against the defendant, regardless of how the prosecutor may acquire that information and regardless of whether any privilege attendant to those records was waived by public disclosure.[1]

If the prosecutor nevertheless reviews those records, he purposefully intrudes into the defendant's attorney-client relationship.  If, at trial, (1) any of "the State's evidence originated in the [intrusion]," (2) the information obtained from the records was "used in any other way to the substantial detriment of [the defendant]," or (3) the State learned details about the defendant's trial preparations from the records, then the intrusion prejudiced the defendant.  *Weatherford v. Bursey*, 429 U.S. 545, 552 (1977).  Error of this type is fundamental and may be raised on appeal even in the absence of a trial objection.

---

[1]Our opinion is limited to cases where, as here, the prosecuting attorney reviewed an indigent defendant's defense billing records while prosecuting that defendant.

Second, notwithstanding the first principle, a defense attorney who (1) creates detailed billing records disclosing confidential client communications and attorney work product, (2) fails to protect strategic defense information from public disclosure during the payment process, or (3) fails to take remedial actions after learning that the prosecuting attorney has reviewed his billing records provides ineffective assistance of counsel. Because the State violated the first principle, and because defense counsel violated the second principle, we find that both Ashley Eva Morrison's Sixth Amendment right to counsel and her Sixth Amendment right to be free from State intrusion into the attorney-client relationship were violated. Because the State acquired and used useful information from those records, we find that Morrison was prejudiced by the State's intrusion and defense counsel's deficient performance. However, because we find that this prejudice can be remedied by granting Morrison a new trial and suppressing the billing records and all evidence derived therefrom on remand, we deny Morrison's request to dismiss the indictment. Accordingly, we reverse the trial court's judgment and remand this case to the trial court for a new trial.

## II. Facts

It is uncontroverted that sixteen-year-old Christian Sims (Sims) shot and killed his grandmother, Annie Lois Sims (Annie). Before the shooting, Sims and his girlfriend, Ashley Morrison (Morrison), ran away from Morrison's home where they had been living together with Morrison's family. That same day, they broke into Sims's aunt's house. While there, Sims retrieved a gun and travelled to Annie's home, where he murdered her. While Sims was at Annie's home committing the murder, Morrison was at Sims' aunt's house. The State's theory at trial was

3

that Morrison was guilty of murder under the law of parties because (1) Morrison knew, in advance, that Sims intended to rob and either assault or kill Annie and (2) she assisted Sims in carrying out that plan. Accordingly, the key fact question at trial was whether Morrison was involved in Annie's murder.

The trial court found that Morrison was indigent and appointed counsel to represent her at trial; additionally, the trial court approved funding for an investigator to assist in Morrison's defense. Before trial, defense counsel requested interim payment for his services and the services of the defense investigator. To support the payment request, defense counsel submitted his and the investigator's billing records to the trial court.[2] Defense counsel's billing records were highly detailed and disclosed confidential attorney work product and attorney-client communications.[3] At some point, the unredacted billing records were filed with the district clerk.

---

[2]Defense counsel submitted two sets of billing records to the trial court for payment, one before trial and one after trial was completed. Both sets of bills contained the same level of detail. Because the State could not have seen the second set of records before the trial, we do not factor the second set of records into our analysis.

[3]Specifically, defense counsel disclosed the following:

- 12/24/14 Jim Chadwick [defense investigator] and I went and looked at the scene of the events that led to our client being jailed. We then went to jail and talked to client. Client tells us that she and the boy she was dating was threatening her family and that she and he left her home on Tuesday nite and walked in the rain; that a man gave them a ride, that they went to the boy's grandparents home, that they then went to church, then went to aunt's home, boy left with gun, came back, they went to OK, and were arrested.

- 12/29/14 Went to jail after lunch and talked to client; told her that we were having bond reduction hearing on December 30. Talked to her about how frightened she was of boy.

  . . . .

- 1/05/15 Met with client at the jail and talked to her about another interview with Stacy McNeil and also about taking a polygraph exam. Went over in detail what happened and talked to her about things she had told that were not exactly true. Went and talked to her parent[s] at their home and brought them up to date as to what is going on.

4

- 1/16/15  Met with Jim Chadwick, He had gotten a letter that the client's parents had received from Christian.

- 1/20/15  Client was polygraphed by secret service.  Client failed the polygraph.  She and boy planned the murder.  She denies being at the scene or participating in the actual murder.

- 1/26/15  Met with Jim about his meeting with client.  Client told him that Christian had told her that he was going to kill his grandmother.

- 1/27/15  Met with client at jail for first time since the polygraph.  She told me what had happened and apologized for not telling Jim and I the truth.  I will talk to [DA] Gary [Young] soon about what he wants to do.

- 1/29/15  Met with Jim Chadwick regarding letter that [Morrison] had sent to her parent.  It was very long and sad.  We discussed what she should tell her parent.  [T]he letter is long and convoluted.

- 2/05/15  Jim and I discussed what we thought Ashley's involvement in the killing to be. We both had believed her and now that she has failed to tell us the truth we have reservations about her overall.

- 2/17/15  Met with Jim regarding getting an expert to help with this girl's case.  We called Jan Langbein and talked to her at length and she said she did not think that this case was within her area of expertise.  Called Chuck Keenan and he referred us to Dr. Rycke L. Marshall in Dallas.  We called Dr. Marshall and left a message asking her to call me.

- 3/16/15  Went to jail and talked to client.  Told client about Christian being diagnosed as incompetent and insane, told her about Dr. Marshall, told her about her indictment, and told her about needing to write her story and have it ready for Dr. Marshall. . . .

- 3/31/15  Went to jail and talked to client.  Told her that Dr. Marshall would be up here next week to talk to her.  Told her to tell Dr. Marshall the truth.  This child is beginning to wear down, and I am very concerned about her.  I hope that Dr. Marshall can give her some help.

- 5/12/15  Called [defense psychologist] Dr. Marshall and talked to her about her interviews with Ashley.  She had lots of thoughts about Ashley being a hostage.  She wants to do some more testing and I want her to be present when I visit with her.

- 6/05/15  Met with Ashley, Dr. Marshall and Jim at the Jail. Dr. Marshall has finished her testing.  She tells us that Ashley was easily influenced and that Sims had taken control of her.  That she was frightened of him and that he had threatened her family.  We agreed that Dr. Marshall is going to do questions for Ashley and then for herself.  We [sic] what would be acceptable for a plea bargain.

- 6/30/15  Talked to Ashley about the hearing on the boy's competency.  Told her about his mental illness.  Talked to her about his mental situation when he was with her.  She said she did not recognize how disturbed he was until he actually killed his grandmother.  She

The evidence against Morrison was circumstantial.[4]  Before trial, the State obtained copies

of defense counsel's billing records and reviewed them.  Based on entries from those records, the

State pursued a line of questioning of Morrison's mother, Misty, suggesting that Morrison admitted

her involvement in the murder in a letter she wrote to Misty from jail.  The State also suggested

that defense counsel had retrieved the letter from Misty prior to trial and was refusing to produce

---

told me he had become more abusive and controlling as their relationship continued and that he would hit her and claim it was an accident.

[4]Among the items of evidence admitted at trial, the State presented Morrison's two recorded statements to Texas Ranger Stacey McNeal, text messages between Morrison and Sims before and after the murder, and surveillance footage from a Walmart in Oklahoma.  The State also presented testimony from a witness with whom Morrison and Sims had hitched a ride the night they left Morrison's home.  There was no direct evidence that Morrison was involved in the murder.  Rather, the State offered an interpretation of the evidence that it believed proved her involvement.

For example, the State argued that Morrison made several inconsistent statements in her two interviews and that those inconsistent statements demonstrated that Morrison knew in advance about Sims' intent to kill his grandmother and that she was in agreement.  The State also claimed that Morrison admitted helping Sims load the weapon used to kill the victim.  In addition, the State argued that the text messages from Morrison's cell phone undercut her claims that they did not intend to travel anywhere the night they left home, but only planned to walk around the city of Paris, Texas.  The State pointed out several texts between Morrison and Sims which it claimed indicated Morrison had no problem with Sims' plan to leave home and was a willing participant in that plan.  The State also pointed out texts by Morrison wherein she was contemptuous towards her parents and voiced approval of Sims' statements that he was going to beat up her father.  The State argued that Morrison had access to a phone at Sims' aunt's house, but that she did not call anyone to help her.  The State also introduced a surveillance recording from the Walmart in Oklahoma after the murder on which Morrison can be seen holding Sims' hand and pointed out that, in one of her statements, she said she told Sims not to take the gun into Walmart and that he complied with her command.  The State argued that that statement showed that she was in charge in their relationship.

The defense argued a different interpretation of the evidence.  According to defense counsel, the evidence depicted a young woman in a relationship with a very troubled young man that spiraled out of control.  Defense counsel argued that she was seventeen years old and that she was being interviewed by very skilled law enforcement agents who were skilled at getting people to say things they did not mean.  Defense counsel disputed that Morrison had admitted helping Sims load the gun, but instead said that, when Sims dropped the bullets, she picked them up off the floor and handed them to him.  Counsel also argued that the evidence must be interpreted from the perspective of a seventeen-year-old girl who was in a car with someone she just learned had killed his grandmother.  He pointed out that, after she and Sims left her home, she did not have her cell phone with her and had no car.  Defense counsel argued that—at seventeen years of age—Morrison did not think as an older adult would think.  Instead, defense counsel argued that her demeanor in her statements was consistent with a frightened young woman rather than someone who had willingly participated in a murder.  Finally, defense counsel argued that there was no reason for Morrison to call anyone from Sims' aunt's house because she was running away.

6

it.[5] Yet, there was no proof that any letter containing an admission by Morrison ever existed.[6]

The jury found Morrison guilty of murder under the law of parties and sentenced her to thirty years' imprisonment.

## II. First Point of Error—Whether the State Violated Morrison's Sixth Amendment Right to Counsel

### A. Introduction

In her first point of error, Morrison argues that the State violated her Sixth Amendment rights when it obtained, reviewed, and then used information from her attorney's billing records

---

[5]Specifically, the State suggested, through Misty's testimony, (1) that Morrison had written her a letter from jail, (2) that Morrison had, at some point, talked to her about the murder, (3) that Misty was so concerned about the letter that she turned it over to her attorney, (4) that she and the attorney and investigator had talked about the letter, (5) that defense counsel had obtained the letter from her before trial, and (6) that, as of the time of trial, the letter could not be found.

[6]It is undisputed that the billing records reflect the existence of a letter that Morrison wrote to Misty from jail prior to trial. It is also undisputed that the letter was "sad" and "convoluted" and that it caused Misty such concern that she called the defense investigator to retrieve the letter. What is in dispute is whether that letter contained an admission by Morrison that she was involved in the murder.

There is no direct evidence that the letter included an admission of involvement. The letter was never admitted into evidence at trial. Only four people saw the letter: Morrison, defense counsel, the defense investigator, and Misty. Morrison did not testify. Defense counsel stated that he did not know of any inculpatory information in any of the letters he obtained from Misty. Although he did not testify, when asked to search the defense files and find the letter referenced in his billing records, the defense investigator produced a letter Sims had written to Misty wherein Sims declared his sole responsibility for the murder. The defense investigator also informed defense counsel via text message that it was the Sims letter he was referencing in his billing records. And Misty consistently testified that she did not recall what was in the letter.

Nor is there any circumstantial evidence that the letter contained that admission. Nothing in the billing record entries suggest the content of the letter. Misty admitted that she "thought [the letter] was of significant import," but she never testified or implied that she deemed it important because it contained an admission by Morrison that she was involved in the murder. Rather, she denied having any recollection or knowledge of the contents of the letter on six different occasions. While Misty was concerned about the contents of the Morrison letter, there is no evidence that the cause for her concern was an admission by Morrison. Accordingly, the State's examination of Misty invited the jury to speculate that the only possible cause for Misty's concern was that the letter contained an admission of guilt. Juries are not permitted to base verdicts on speculation. *See Hooper v. State*, 214 S.W.3d 9, 16 (Tex. Crim. App. 2007) ("juries are permitted to draw multiple reasonable inferences from the evidence (direct or circumstantial), but they are not permitted to draw conclusions based on speculation").

7

against her.[7] The State responds that it did not purposefully intrude into Morrison's attorney-client relationship because the billing records were filed as public records, and therefore, it was entitled to review those records. In support of this argument, the State only cites general cases holding that the duties of clerks are ministerial in nature and that the purpose for those duties is to ensure that all persons have access to public documents. *See Cobra Oil & Gas Corp. v. Sadler*, 447 S.W.2d 887, 896 (Tex. 1968); *Morales v. State*, 11 S.W.3d 460, 465 (Tex. App.—El Paso 2000, pet. ref'd). In view of the statutory and constitutional implications of indigent defense representation, and the lack of justification for the State to obtain and review indigent defense counsel's billing records, we find that the State's review of defense counsel's billing records in this case constituted a purposeful intrusion into Morrison's attorney-client relationship.

### B.     Applicable Law

The United States Supreme Court has held that the State violates a defendant's Sixth Amendment right to counsel if it purposefully intrudes into that relationship and the intrusion "produce[s], directly or indirectly, any of the evidence offered at trial." *Weatherford*, 429 U.S. at 552. An intrusion "produce[s], directly or indirectly, any of the evidence offered at trial" when (1) "the State's evidence originated in the [intrusion]," (2) the intrusion is "used in any other way to the substantial detriment of [the defendant]," or (3) the State learns details about the defendant's trial preparation. *Id*. at 554; *see also Murphy v. State*, 112 S.W.3d 592, 602 (Tex. Crim. App.

---

[7]In her original brief on appeal, Morrison contends that the State violated her Sixth Amendment rights and that defense counsel provided ineffective assistance at trial. However, the billing records at issue were not included in the original clerk's record. After Morrison filed her brief to this Court, the district clerk filed a supplemental clerk's record including the billing records. At that point, Morrison filed a Motion to Reopen Briefing Based on New Evidence. That motion was granted by letter from this Court dated March 21, 2018, and Morrison filed her supplemental brief before the State filed its brief. Thus, we consider both briefs in evaluating the issues on appeal.

2003) (holding that "the State's intrusion into the attorney-client relationship violates a defendant's constitutional right to counsel when the defendant is prejudiced by the violation"). The United States Supreme Court also has held that, "at the very least, the prosecutor . . . [has] an affirmative obligation not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel." *Moulton*, 474 U.S. at 170–71. Finally, a purposeful intrusion can occur even where the State does not create the circumstances that made the information available if the State exploits an opportunity to obtain information otherwise protected from disclosure. *See id.* at 176 (holding that a "knowing exploitation by the State of an opportunity to confront the accused without counsel being present is as much a breach of the State's obligation not to circumvent the right to the assistance of counsel as is the intentional creation of such an opportunity"); *see also Shillinger v. Haworth*, 70 F.3d 1132, 1141 (10th Cir. 1995) (holding that prosecutor purposefully intruded into the attorney-client relationship when he obtained information regarding defense counsel's practice sessions with defendant prior to trial from jailer assigned to guard defendant during the sessions).

### C.     Analysis

To determine whether the State intruded into Morrison's attorney-client relationship by reviewing defense counsel's billing records, we first consider the law governing the appointment and compensation of defense counsel for indigent defendants.

#### 1.     Attorney Billing Records Are Attorney Work Product

Attorney billing records constitute attorney work product. *See In re Nat'l Lloyds Ins. Co.*, 532 S.W.3d 794, 803 (Tex. 2017) (holding that "a request to produce all billing records invades a

9

party's work-product privilege because, cumulatively, billing records constitute a mechanical compilation of information that, at least incidentally, reveals an attorney's strategy and thought processes"). Thus, "[d]iscovery of billing records in their entirety would provide a roadmap of how the [party] plans to litigate not only this particular case, but all other . . . cases." *Id.* The Court of Criminal Appeals has held that the attorney work-product privilege also applies in criminal cases, noting, "The work product privilege has generally been limited to documents which themselves do not contain admissible evidence of the offense but instead are summaries of the evidence or discussions about the offense that have been prepared for the internal use of" attorneys and investigators. *Washington v. State*, 856 S.W.2d 184, 189–90 (Tex. Crim. App. 1993) (quoting *Quinones v. State*, 592 S.W.2d 933, 940 (Tex. Crim. App. 1980), *cert. denied*, 449 U.S. 893 (1980). The Court of Criminal Appeals has also held that "[a] document that contains 'comments by the attorney containing his strategy or opinions of the strengths and weaknesses of the case' is highly privileged work product[, and a] document of this nature is precisely the type of document intended to be protected by the work product doctrine." *Skinner v. State*, 956 S.W.2d 532, 538–39 (Tex. Crim. App. 1997). Defense counsel's billing records clearly contain "comments by the attorney concerning his strategy [and] opinions of the strength and weaknesses of the case . . . ." *Id.* Accordingly, defense counsel's billing records constituted attorney work product.

### 2. Appointed Defense Attorneys for Indigent Defendants Are Required by Statute to Present Itemized Requests for Payment to the Trial Court When Requesting Payment

An indigent criminal defendant has a statutory right to the appointment of counsel at the county's expense. *See* TEX. CODE CRIM. PROC. ANN. art. 1.051(c) (West Supp. 2018). The right

of an indigent criminal defendant to the appointment of counsel is also constitutionally mandated. *See Gideon v. Wainwright*, 372 U.S. 335, 343 (1963) (quoting *Grosjean v. Am. Press Co.*, 297 U.S. 233, 243–44 (1936) (holding that "certain fundamental rights, safeguarded by the first eight amendments against federal action, [are] also safeguarded against state action by the due process clause of the Fourteenth Amendment, and among them the fundamental right of the accused to the aid of counsel in a criminal proceeding")).

Article 26.05(a) of the Texas Code of Criminal Procedure mandates the payment of a "reasonable attorney's fee" to "counsel . . . appointed to represent a defendant in a criminal proceeding." TEX. CODE CRIM. PROC. ANN. art. 26.05(a) (West Supp. 2018). However, the right to payment is balanced against the risk that county governments could be forced to pay excessive fees. *In re Collin Cty.*, 528 S.W.3d 807, 812 (Tex. App.—Dallas 2017, orig. proceeding) ("By requiring the judges to set both minimum *and* maximum hourly rates, it is clear that the legislature was concerned not only with attorneys receiving a fair rate of payment, but also with counties not being forced to pay excessive fees."). Accordingly, Article 26.05 states, "No payment shall be made under this article until the form for itemizing the services performed is submitted to the trial judge presiding over the proceedings . . . and until the judge . . . approves payment." TEX. CODE CRIM. PROC. ANN. art. 26.05(c) (West Supp. 2018). Therefore, to receive payment for services provided to an indigent criminal defendant—which the State is constitutionally and statutorily required to provide—appointed counsel must submit itemized billing statements to the trial court for approval pursuant to the schedule of fees adopted for the county. Itemization is necessary for

11

the trial court to determine if the work provided was reasonable, necessary, and consistent with the fee schedule adopted by the judges trying criminal cases in the county.

### 3.  Possession of a Defense Attorney's Billing Records Prior to Trial Gives the State a Strategic Advantage Over Indigent Defendants

Generally, the State has no right of discovery against the Defendant in a criminal case.[8]

*See Washington*, 856 S.W.2d at 187 (noting that "discovery in Texas criminal cases has been a 'one-way proposition,' with the focus on requests by defendants for discovery and the State resisting those requests" and that while "criminal defendants . . . have been granted limited discovery . . . [n]o similar provision grants the right to discover evidence to the State") (citing *Demouchette v. State*, 731 S.W.2d 75, 81 (Tex. Crim. App. 1986) (stating in dicta that the State "has no right of discovery into the defendant's case")); *see also* TEX. CODE CRIM. PROC. ANN. art. 39.14(a) (West Supp. 2018) ("as soon as practicable after receiving a timely request from the defendant, *the State* shall produce [information] that constitute[s] or contain[s] evidence material to any matter involved in the action and that [is] in the possession, custody, or control of the State

---

[8]Of course, there are exceptions to this general rule.  For example, the State is entitled to the names and addresses of any expert witnesses the defendant intends to call at trial.  *See* TEX. CODE CRIM. PROC. ANN. art. 39.14(b) (West Supp. 2018); *see also Pope v. State*, 207 S.W.3d 352, 360 (Tex. Crim. App. 2006).  Likewise, a defendant may be required to disclose a witnesses' notes if the witness makes testimonial use of the material at trial.  *Skinner v. State*, 956 S.W.2d 532, 539 (Tex. Crim. App. 1997); *see also Ballew v. State*, 640 S.W.2d 237, 240 (Tex. Crim. App. 1980) (holding that attorney-client privilege extended to defendant's psychiatric expert witness was waived when he took the stand and testified and that, therefore, his notes and reports from examinations were discoverable).  Also, there are instances where a defense attorney has an ethical duty to produce evidence to the State.  *See Henderson v. State*, 962 S.W.2d 544 (Tex. Crim. App. 1997) (holding that—even though defendant had admitted to police that kidnapped child was already dead—trial court could compel defense counsel to produce map identifying the location of the child's body created by defendant for her attorneys because attorney-client privilege must yield to policy interests behind ethical rule requiring disclosure of confidential communications necessary to prevent death or serious bodily injury of another person).

12

. . . .") (emphasis added).[9]  Making defense counsel's itemized billing statements available to the State would allow the State to discover information about the defendant's case it would not otherwise be entitled to discover under the Code of Criminal Procedure.  In essence, it would give the State a potential "roadmap of how the [defendant] plans to litigate . . . this particular case. . . ." *Nat'l Lloyds*, 532 S.W.3d at 803.

Moreover, only attorneys appointed to represent indigent defendants are required to submit their itemized bills to the trial court for payment.  Therefore, only indigent defendants are at risk of disclosing non-discoverable information to the State as part of the compensation procedure.  To interpret Article 26.05 as rendering attorney's billing statements fair game for the State's review and use should those bills somehow find their way into the clerk's record would place indigent defendants on the horns of a dilemma not faced by non-indigent defendants.

Under that interpretation, indigent defendants must accept the risk that their attorney's itemized billing statements possibly containing a roadmap of their defense could be filed with the district clerk and used against them at trial when they invoke their constitutional and statutory right

---

[9]By contrast, Rule 16(b)(1) of the Federal Rules of Criminal Procedure provides for reciprocal discovery to the government:

> **(b)**      **Defendant's Disclosure.**
>   **(1)**      **Information Subject to Disclosure.**
>     **(A)**      **Documents and Objects.**  If a defendant requests disclosure under Rule 16(a)(1)(E) [requiring production of documents and objects by government upon request] and the government complies, then the defendant must permit the government, upon request, to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items if:  (i) the item is within the defendant's possession, custody, or control; and (ii) the defendant intends to use the item in the defendant's case-in-chief at trial.

FED. R. CRIM. PROC. ANN. 16(b)(1).  No such right of reciprocal discovery exists in the Texas Code of Criminal Procedure.

to appointed counsel.[10]  Because a retained attorney never has to submit bills to the trial court for review and payment, such an interpretation of Article 26.05 would unconstitutionally burden only indigent defendants.[11]  *Cf. Griffin v. Illinois*, 351 U.S. 12, 17 (1956) ("Both equal protection and due process emphasize the central aim of our entire judicial system—all people charged with crime must, so far as the law is concerned, 'stand on an equality before the bar of justice in every American court.'") (quoting *Chambers v. Florida*, 309 U.S. 227, 241 (1940)).[12]

### 4. Prosecutors Have No Involvement in the Approval of Requests for Payment by Defense Attorneys, and There is no Legitimate Law Enforcement Reason for Prosecutors to Have Access to Such Information

The actual payment of defense counsel's attorney fees is purely an administrative matter. The State's attorney has no role in the payment of fee requests or the establishment of fee schedules.  Accordingly, there is no legitimate law enforcement reason for a prosecutor to review an indigent defendant's attorney's billing statements during the pendency of the case against that

---

[10]This interpretation would also create an internal conflict between the defense attorney's duty to protect his client's defense strategy from disclosure and the defense attorney's own interest in receiving compensation.  To fully protect his client's interest, the attorney would put little to no detail in his billing records, but to demonstrate that his charges are reasonable and necessary, he would need to put more detail.  This conflict furthers neither the purposes behind indigent defense nor the need to avoid payment of excessive fees.

[11]See *United States v. Meriwether*, 486 F.2d 498, 506–07 (5th Cir. 1973) (noting that Rule 17(b) of the Federal Rules of Criminal Procedure specifically allows *ex parte* procedure for indigent defendants to obtain witness subpoenas because "serious equal protection questions are raised" "if an indigent defendant's case [is] to be subjected to pre-trial scrutiny by the prosecutor, while the monied defendant is able to proceed without such scrutiny"); *see also Williams v. State*, 958 S.W.2d 186, 193 (Tex. Crim. App. 1997) (holding that, "if an indigent defendant is not entitled to an *ex parte* hearing on his *Ake* motion, he is forced to choose between either foregoing the appointment of an expert disclosing to the State in some detail his defensive theories about weaknesses in the State's case" and that this result "is contrary to *Ake's* concern that an indigent defendant who is entitled to expert assistance have 'meaningful access to justice,' and undermines the work product doctrine").

[12]See *Reese v. State*, 772 S.W.2d 288, 290 (Tex. App.—Waco 1989, pet. ref'd) (holding that, "when a rule may be fairly given two interpretations, one of which results in its validity, a court must presume that the enacting authority did not intend to adopt an invalid rule, and shall interpret it so that it will be valid and constitutional").

defendant. To allow the State to do so simply because, in the process of getting paid, the defense billing records ended up in the clerk's record would be tantamount to permitting the prosecutor to read defense counsel's file because he was required to allow his briefcase to be searched by security before entering the courtroom.

**5.** **Given Their Special Status, Prosecuting Attorneys Have a Duty to Refrain from Reviewing the Billing Records of an Indigent Defendant's Attorney**

While it is true that public records are available to the public and that the attorney work-product privilege can be waived by disclosure, a prosecuting attorney is no ordinary member of the public who might otherwise be entitled to review such information. Article 2.01 of the Texas Code of Criminal Procedure states, "It shall be the primary duty of all prosecuting attorneys . . . not to convict, but to see that justice is done." TEX. CODE CRIM. PROC. ANN. art. 2.01 (West 2005). The Texas Court of Criminal Appeals has held,

> As a trustee of the State's interest in providing fair trials, the prosecutor is obliged to illuminate the court with the truth of the cause, so that the judge and jury may properly render justice. Thus, the prosecutor is more than a mere advocate, but a fiduciary to fundamental principles of fairness.

*Duggan v. State*, 778 S.W.2d 465, 468 (Tex. Crim. App. 1989) (citing *Berger v. United States*, 295 U.S. 78, 88 (1935)). Further, "[t]he Sixth Amendment also imposes on the State an affirmative obligation to respect and preserve the accused's choice to seek assistance," which means, "at the very least, the prosecutor . . . [has] an affirmative obligation not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel." *Moulton*, 474 U.S. at 170–71.

It can hardly be considered a "fundamental principle of fairness" that a potential roadmap of an indigent defendant's case as contained in her attorney's billing records—which exists only

15

because the statute requires it as a condition for payment—becomes fair game for the State's review and use against her at trial should it be disclosed during the processing of defense counsel's request for payment. *Duggan*, 778 S.W.2d at 468. Allowing the State to do so clearly "circumvents and thereby dilutes the protection afforded by the right to counsel." *Moulton*, 474 U.S. at 170–71. Moreover, it is irrelevant whether the public filing of defense counsel's billing records waived the attorney work-product privilege. The State's "affirmative obligation not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel," *Id.* at 170–71—and the concomitant duty to refrain from reviewing the records—still applies. No matter who may be entitled to review such records, the State cannot.[13]

---

[13]To the extent the State argues that its intrusion was not purposeful because the records were on file with the district clerk, we previously noted that a purposeful intrusion can occur where the State exploits an opportunity to circumvent the attorney-client relationship even if the State did not create the opportunity itself. *Moulton*, 474 U.S. at 176. We also cited to *Shillinger* as an example of how a purposeful intrusion can occur through the State's exploitation of an opportunity to circumvent the attorney-client relationship not of its own making. *Shillinger*, 70 F.3d at 1134. In *Shillinger*, the defendant,

> Haworth[,] was unable to make bail, [and] he remained in jail before his trial. When the trial date approached, Haworth's attorney arranged to hold several preparatory sessions with Haworth in the trial courtroom. Because Haworth was in custody, these pretrial preparatory sessions were held on the condition that a deputy sheriff would be present at all times. Haworth's attorney paid the deputy overtime wages for his services; he also allegedly instructed the deputy to consider himself an employee of defense counsel during the preparatory sessions and that "none of this goes out of this room," although the prosecutor denied there was such an understanding.

*Id.* At trial, when the prosecutor began cross-examining Haworth about information discussed during the preparatory sessions, "it became apparent to Haworth's defense counsel that the prosecutor had learned not only about Haworth's weekend trial preparation sessions with defense counsel, but also about the substance of some of the conversations between Haworth and defense counsel during those sessions." *Id.* (quoting *Haworth v. State*, 840 P.2d 912, 913 (Wyo. 1992)). The Court of Appeals then noted that "[t]he prosecutor admitted at this [in-chambers] conference that his knowledge of the preparatory sessions was acquired through a conversation with the deputy that was initiated by the prosecutor." *Id.* at 1135. The Court of Appeals concluded,

> This is not a case in which the State's interest in effective law enforcement is at issue. Rather, this is a case in which the prosecutor, by his own admission, proceeded for the purpose of determining the substance of Haworth's conversations with his attorney, and attorney-client communications were actually disclosed. This sort of purposeful intrusion on the attorney-client relationship strikes at the center of the protections afforded by the Sixth Amendment and made applicable to the States through the Fourteenth Amendment.

*Id.* at 1141. Although the prosecutor did not create the opportunity for disclosure of the privileged information, he exploited that opportunity by inquiring of the deputy sheriff what was said during the preparatory sessions.

Given (1) the constitutional basis for indigent defense, (2) the administrative nature of billing record submissions, (3) the work product status of those records, (4) the strategic advantage such records would potentially give the State, (5) the privileged nature of such records, (6) the fact that billing records are only submitted in indigent defense cases, and (7) the State's unique responsibility as a "fiduciary to fundamental principles of fairness," *Id.*, it is clear that the State's "affirmative obligation not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel," *Id.* at 170–71, necessarily imposes a duty on a prosecuting attorney to refrain from reviewing an indigent defendant's attorney's billing records during the pendency of the case against that defendant, no matter how they are acquired and regardless of whether any privilege attendant to those records was waived by public disclosure.[14]

---

Likewise, "[t]his is not a case in which the state's interest in effective law enforcement is at issue." *Id.* Nor is it a case where the State created the opportunity to discover Morrison's confidential communications with her defense counsel or his attorney work product contained in the billing records. "Rather, this is a case in which the prosecutor, by his own admission," purposefully acquired that information from the district clerk and then purposefully reviewed it to determine what information was present so that he could use it against her at trial. *Id.* Accordingly, the State purposefully intruded into Morrison's attorney-client relationship by exploiting the opportunity to discover her confidential communications and attorney work product contained in the billing records.

[14]It could be forcefully argued that, upon discovering their public disclosure, the State not only has a duty to refrain from reviewing such information, but also has an affirmative duty to secure the information. For example, in the following reported state and federal cases involving the interception of documents containing privileged attorney-client information, prosecutors took significant, affirmative steps to protect the information once they found that it was in their possession: *Woodruff v. State*, 330 S.W.3d 709, 725 (Tex. App.—Texarkana 2010, pet. ref'd) (local district attorney's office recused itself, the trial court appointed the Texas Attorney General as a special prosecutor, and "instructed the Texas Attorney General's Office to 'have no contact with the Hunt County District Attorney concerning the case until further order of the Court,'" and "the trial court requested a visiting judge be appointed to 'ensure any suppressed evidence is not transmitted from the District Attorney to the Attorney General'"); *State v. Bain*, 872 N.W.2d 777 (Neb. 2016) (after first defense counsel was hired by the district attorney prosecuting case, district attorney withdrew and attorney general was appointed; when assistant attorney general found confidential communications between defendant and his former counsel in the State's file, he "sealed the confidential documents in a tamper-proof envelope so that no one else could see them, and he asked the court to keep them sealed;" then attorney general moved "to withdraw as prosecutors due to a conflict of interest"); *United States v. Neill*, 952 F.Supp. 834, 836–37 (D.D.C. 1997) (in executing search warrant for a law office, "FBI agents attorneys were directed to serve as Principal Legal Advisors (PLA's) on site to review all potentially privileged documents prior to seizure," the "PLA then reviewed each document for which counsel claimed privilege seizing some and returning others to counsel"; then

17

### 6. Conclusion

For the foregoing reasons, we find that the State purposefully and improperly intruded into Morrison's attorney-client relationship when it obtained and reviewed Morrison's defense billing records.

### D. The State's Intrusion into Morrison's Attorney-Client Relationship Prejudiced her at Trial

#### 1. Standard of Review

As noted above, it is not enough that a defendant proves a purposeful intrusion, she must also prove that she was prejudiced by that intrusion. *Murphy*, 112 S.W.3d at 602. A defendant is prejudiced by the State's intrusion into the attorney-client relationship if the State's intrusion into her attorney-client relationship "produced, directly or indirectly, any of the evidence at trial." *Weatherford*, 429 U.S. at 552. The defendant satisfies her burden by showing one of the three following propositions: (1) that the State acquired evidence that originated by virtue of the intrusion, (2) that any information acquired by the State as a result of the intrusion is "used in any other way to the substantial detriment of [the defendant]," or (3) that the State learned details about the defendant's trial preparations. *Id.* at 554.

---

FBI "taint team" was created to review the materials "meaning that their actions would be 'walled off' from the prosecution team thereby ensuring that the prosecution team remained free of the 'taint' arising from exposure to potentially privileged material"); *see also State v. Lenarz*, 22 A.3d 536, 550 n.14 (Conn. 2011) ("[W]e do not believe that it imposes an unreasonable burden on the State to take steps to insulate a prosecutor who has knowledge of the defendant's confidential trial strategy from involvement in the case. . . . If the government made no such efforts, its conduct can hardly be characterized as blameless."). Nevertheless, we need not consider whether the State's duty goes beyond merely refraining from reviewing the information because in this case, the State not only failed to secure the information, it reviewed the records before trial and then used the information from those records against Morrison at trial.

### 2. Analysis

It is conceivable that the State might purposefully intrude into the defendant's attorney-client relationship, but the intrusion would not prejudice the defendant because nothing of value was gained. *See Woodruff v. State*, 330 S.W.3d 709, 724 (Tex. App.—Texarkana 2010, pet. ref'd), *cert. denied*, 565 U.S. 977 (2011) (holding that prejudice was not shown because "[t]he record . . does not contain evidence that the prosecutor or the police obtained any useful information"). Likewise, the State's intrusion might not prejudice the defendant because nothing was obtained that was not already known to the State. *See Murphy*, 112 S.W.3d at 602 (holding that jail inspection providing the State with defendant's correspondence with his attorney was not prejudicial because the correspondence did not contain any information that was not already in the State's possession from other sources).

In this case, however, the State obtained useful information from the billing records because it was able to suggest that Morrison had written a letter to her mother admitting her involvement in the murder based on those entries. Because there is no evidence that such a letter ever existed,[15] then the State's examination of Misty and arguments to the trial court in front of the jury improperly invited the jury to speculate about the existence of a letter wherein Morrison admitted she was involved. Because the primary question before the jury was whether Morrison was involved in the murder or was simply a bystander to Sims' actions, and because resolution of that question required the jury to interpret the evidence before it, the State used the billing entries regarding the letter to shape the jury's interpretation of the other evidence.

---

[15]*See supra* note 6.

Likewise, there is nothing in the record showing that the information regarding Morrison's letter to Misty came from any source other than defense counsel's billing records. In fact, the State admitted to the trial court that the source for that information was the billing records themselves: "I e-mailed [defense counsel] last week and told him I'd reviewed his billing statements specifically regarding a letter that he received from Ms. Morrison." Thus, in this case, the State "used [information from the billing records] . . . to the substantial detriment of [Morrison]." *Id*.

Finally, as mentioned previously, we find that there is no evidence that a letter containing such an admission existed. However, even if it could be said that Misty's testimony and the billing records constitute circumstantial evidence establishing the existence of an inculpatory letter, then the State "acquired evidence that originated by virtue of the intrusion." *Id*. In that instance, the State's intrusion into Morrison's attorney-client relationship would have "produced, directly or indirectly, any of the evidence at trial" by interjecting its theory about the inculpatory letter before the jury. *Weatherford*, 429 U.S. at 552. Therefore, regardless of whether the State's speculative theory is without evidentiary support—as we find here—or whether Misty's testimony is somehow circumstantial evidence to support that theory, Morrison was prejudiced by the State's intrusion into her attorney-client relationship.

### E. The State's Intrusion into Morrison's Attorney-Client Relationship Was Not Harmless

#### 1. Standard of Review

If the defendant meets her burden of proof and establishes a purposeful intrusion into her attorney-client relationship and that she was prejudiced by that intrusion, then the State, as the "'beneficiary of [the] constitutional error' must 'prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Wall v. State*, 184 S.W.3d 730, 746, n.53 (Tex. Crim. App. 2006). In resolving this question, "[w]e must calculate, as nearly as possible, the probable impact of the error on the jury in light of the other evidence. If there is a reasonable likelihood that the error materially affected the jury's deliberations, then the error is not harmless beyond a reasonable doubt." *Id*. at 746 n.52, 53. In making this determination, the Court of Criminal Appeals has identified certain non-exclusive factors to consider "including (1) the nature of the error, (2) the extent the error was emphasized by the State, (3) the weight a juror would probably place on the error, and (4) the error's probable collateral consequences."[16] *Flowers*, 438 S.W.3d at 110 (citing *Snowden*, 353 S.W.3d at 822).

Moreover,

> "there is no set formula for conducting a harm analysis that necessarily applies across the board to every case and every type of constitutional error." These factors

---

[16]It is not clear that a harmless-error analysis as defined by the Court of Criminal Appeals is required once prejudice has been established under *Weatherford*'s three-part test. *See Weatherford*, 429 U.S. at 552. On the one hand, it seems that, once the *Weatherford* test has been satisfied, the Court of Criminal Appeals' four-part, harmless error test is automatically satisfied as well. For example, an appellate court does not perform a separate harmless error analysis when a defendant establishes "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 694 (1984) (adopting the standard for prejudice in ineffective assistance of counsel used "in the test for materiality of exculpatory information not disclosed to the defense by the prosecution," and "the test for materiality of testimony made unavailable to the defense by Government deportation of a witness") (citing *United States v. Agurs*, 427 U.S. 97, 104, 112–13 (1976); *United States v. Valenzuela-Bernal*, 458 U.S. 858, 872–74 (1982)). Therefore, it would follow that a harmless-error analysis

21

"are not exclusive considerations in any particular case," and our inquiry should be "whether, or to what extent, the error may have contributed to the conviction" or increased the punishment. The ultimate inquiry is "'whether, assuming that the damaging potential of the [inadmissible evidence] were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt.'"

*Id.* Finally, even though error is harmless "if the jury's verdict would have been the same even if the erroneous evidence had not been admitted[,] . . . if error has even a 'slight effect,' it is not, beyond a reasonable doubt, harmless." *Id.* (citing *Clay v. State*, 240 S.W.3d 895, 904 (Tex. Crim. App. 2007); *Phillips v. State*, 193 S.W.3d 904, 913 (Tex. Crim. App. 2006)).

### 2. Analysis

As noted previously, the State's theory of Morrison's guilt was that she aided and assisted Sims in carrying out the murder as a party under Texas law. For the jury to find her guilty, it had to find that the evidence established beyond a reasonable doubt that Morrison, "acting with intent to promote or assist the commission of the offense, . . . solicit[ed], encourage[ed], direct[ed], aid[ed], or attempt[ed] to aid [Sims] to commit the [murder of Annie Sims.]" TEX. PENAL CODE

---

would not apply to a State-intrusion Sixth Amendment violation either. On the other hand, the Supreme Court did not discuss the standard of prejudice in *Weatherford* because it did not find prejudice. In the absence of a clear discussion on the matter by the Supreme Court, it could be argued that, even if the *Weatherford* test is satisfied, it merely constitutes non-structural, constitutional error subject to a harmless-error analysis.

In *Murphy*, the Court of Criminal Appeals only held that prejudice must be shown because "only errors that the Supreme Court has designated as 'structural' are categorically immune from harmless error analysis;" it did not hold that, once prejudice is shown, the appellate court must then determine whether the error was harmless. *Murphy*, 112 S.W.3d at 602. However, in *Murphy*, the Court of Criminal Appeals did not find prejudice; therefore, it did not reach the issue of whether satisfying the *Weatherford* three-part test automatically satisfies the Court of Criminal Appeals four-part, harmless-error test. A Sixth Amendment violation is a constitutional error, and Rule 44.2(a) of the Texas Rules of Appellate Procedure applies to "constitutional error that is subject to harmless error review." TEX. R. APP. P. 44.2(a). We are aware of no case holding that a State-intrusion Sixth Amendment violation is structural error. Accordingly, it is not clear whether satisfying the *Weatherford* three-part test for prejudice automatically satisfies the four-part harmless error test or not. In the absence of clear authority on this issue, we will evaluate the four-part, harmless-error test as well.

22

ANN. § 7.02(a)(2) (West 2011).  Thus, the key issue before the jury was whether Morrison was involved in the murder and was not simply a bystander to Sims' actions.  The State's examination of Misty and its arguments to the trial court about the letter went directly to that issue.

In addition, the evidence against Morrison was subject to interpretation.  There was no direct evidence that Morrison was involved in the murder.  Instead, the State sought to establish her involvement circumstantially by showing that her conduct and statements before, during, and after the murder suggested her involvement.  Consequently, the nature of the error is that it suggested the existence of other evidence not in the record and it invited the jury to speculate that that evidence was inculpatory.

The Court of Criminal Appeals has held that the State engages in prosecutorial misconduct where it "inject[s] matters not in the record," which "is clearly improper."  *Berryhill v. State*, 501 S.W.2d 86, 87 (Tex. Crim. App. 1973).  The Court of Criminal Appeals noted that "argument inviting speculation is even more dangerous because it leaves to the imagination of each juror whatever extraneous 'facts' may be needed to support a conviction.  Logical deductions from evidence do not permit within the rule logical deductions from non-evidence."  *Id*.  Therefore, the nature of the error was significant.

The State notes that the letter was never admitted into evidence, there was no other evidence establishing an incriminating statement by Morrison, and "the jury heard about this jail-letter for a brief period of time that comprised approximately five (5) pages of the Reporter's Record."  It is true that the State did not emphasize the error repeatedly.  Accordingly, the second factor weighs in the State's favor.

23

On the other hand, the nature of the error was one which a juror would give great weight in a case like this. As noted, this was a circumstantial case of guilt, and the key question for the jury was whether Morison was involved in the murder. The suggestion that a letter containing an admission by her of her involvement in the murder—together with the implication that defense counsel had retrieved the letter and had failed to produce it—could have strongly influenced how the jury viewed the other evidence at trial. Because the State's theory regarding the letter was speculative, and because it went directly to the primary factual question for the jury to decide, the jury was likely to give great weight to the error. Accordingly, the third factor weighs against the State.

Finally, the probable collateral consequences were significant. By suggesting that Morrison had admitted her involvement in the murder in a letter to her mother, the State cast the other evidence in a more negative light. In fact, the State argued to the jury that Morrison was essentially lying about her lack of involvement. To suggest that she had written a letter admitting her involvement prior to trial would tend to bolster the State's argument that she was lying.

Also, by suggesting in front of the jury that defense counsel had retrieved the letter and should produce it suggested that defense counsel knew it was inculpatory and was hiding it from the jury. Moreover, although the matter was discussed in detail after the jury was excused, this suggestion was initially made in front of the jury. However, no explanation was ever given to the jury when it was brought back into the courtroom. Instead, they were left to speculate about the letter's existence and defense counsel's possession of it. The fourth factor weighs strongly against the State.

24

In sum, while the second factor weighs in the State's favor, the other factors weigh against it. Consequently, we find that the error resulting from the State's Sixth Amendment violation had "even a 'slight effect'" on the jury's verdict and, therefore, was not harmless beyond a reasonable doubt.

**F.    Morrison Did Not Waive her Sixth Amendment Claim Against the State by Failing to Object to the State's Use and Possession of the Billing Records**

The State argues that Morrison forfeited any argument that it violated her Sixth Amendment right to counsel when she failed to object to the State's review and use of defense counsel's billing records at trial. The Court of Criminal Appeals has held that, generally, "all a party has to do to avoid forfeiture of a complaint on appeal is to let the trial judge know what he wants, why he thinks himself entitled to it, and to do so clearly enough for the judge to understand him at a time when the trial court is in a proper position to do something about it." *Lankston v. State*, 827 S.W.2d 907, 909 (Tex. Crim. App. 1992). Morrison did not object to either the State's possession or use of defense counsel's billing records against her.

In *Marin v. State*, the Texas Court of Criminal Appeals noted that there are three categories of rights: (1) forfeitable rights, (2) waivable rights, and (3) non-waivable rights. *Marin v. State*, 851 S.W.2d 275, 279–80 (Tex. Crim. App. 1993), *overruled on other grounds by Cain v. State*, 947 S.W.2d 262 (Tex. Crim. App. 1997). The Court of Criminal Appeals held that most rights are forfeitable. *Id*. at 278. On the other hand, "[r]ights which are waivable only, as well as absolute systemic requirements and prohibitions, cannot be made subject to rules of procedural default because, by definition, they are not forfeitable." *Id*. at 279. Fundamental errors are trial errors

which implicate non-forfeitable rights. Since such rights are non-forfeitable, they cannot be forfeited on appeal by failing to lodge a trial objection to their violation at trial.

Different characterizations of fundamental error have been offered.[17] Yet, no consistent definition has emerged. Essentially, the cases declaring certain errors to be fundamental constitute

---

[17]*See Hensarling v. State*, 829 S.W.2d 168, 173 (Tex. Crim. App. 1992) (Maloney, J., dissenting) (asserting that error is fundamental when "the alleged error is such that it calls into question whether the accused received a fair and impartial trial and 'implicates the due course of law clause of the Texas Constitution.'"); *Smith v. State*, 463 S.W.3d 890, 901 (Tex. Crim. App. 2015) (Yeary, J., dissenting) (asserting that, "[i]f . . . Appellant's claim really does fall within *Marin's* category one—if society simply will not tolerate a conviction under a penal statute that has been judicially declared unconstitutional on its face—then Appellant will be permitted to raise his complaint for the first time in . . . habeas corpus proceedings"); *Ieppert v. State*, 908 S.W.2d 217, 220 (Tex. Crim. App. 1995) (asserting that fundamental error was shown because "the constitutional prohibition against *ex post facto* legislation is not an individual right at all . . ." and "the people may not waive this prohibition, either individually or collectively, any more than they may consent to be imprisoned for conduct which does not constitute a crime"); *Aldrich v. State*, 104 S.W.3d 890, 896 (Tex. Crim. App. 2003) (Holcomb, J., dissenting) (asserting that fundamental error was shown because "the . . . errors . . . were . . . of the type that could generate public disrespect or suspicion regarding the fairness and accuracy of judicial proceedings"); *Saldano v. State*, 70 S.W.3d 873, 893–94 (Tex. Crim. App. 2002) (Johnson, J., dissenting) (asserting that error was fundamental where the testimony in question "violated some of the most fundamental principles of our legal system" and that "it is impossible to determine to what extent" the error "influenc[ed] the deliberations of a given jury"); *Rose v. State*, 752 S.W.2d 529, 537 (Tex. Crim. App. 1987), *abrogated by Karenev v. State*, 281 S.W.3d 428 (Tex. Crim. App. 2009) (asserting that fundamental error existed because an erroneous parole law instruction "is virtually immune from challenge," that its effect on jury "can never properly be discovered and adequately determined," and that "[t]he risk that punishment will be based on extraneous considerations is intolerable in a society that constitutionally demands concepts of fundamental fairness be honored in its criminal justice system"); *Karenev*, 281 S.W.3d at 439–40 (Cochran, J., concurring) (reasoning that error in convicting appellant under a penal statute that had previously been declared unconstitutional by the Court of Criminal Appeals was fundamental because the "main reasons for requiring a contemporaneous objection in the trial court" do not apply); *G.A.O. v. State*, 854 S.W.2d 710, 715 (Tex. App.—San Antonio 1993, no pet.) (asserting that "[f]undamental error is error that directly and adversely affects the interests of the public generally, as such interest is declared in statutes or the constitutions of the State").

In *Blue v. State*, a plurality of the Court of Criminal Appeals found that "appellant's failure to object to the trial judge's comments [indicating his disapproval of the appellant's refusal to accept the State's plea offer] did not waive error." *Blue v. State*, 41 S.W.3d 129, 133 (Tex. Crim. App. 2000). Yet, the judges disagreed as to the basis for that decision. *See* 43A George A. Dix, et al., *Texas Practice Series: Criminal Practice & Procedure*, § 53:135 (3d ed. 2011). The judges in the plurality decision held that the error was fundamental because the trial judge's comments "tainted appellant's presumption of innocence in front of the venire." *Blue*, 41 S.W.3d at 132 (Johnson, J., plurality opinion announcing the judgment of the trial court)). Judge Mansfield concurred, but held that the error was fundamental because it "denied appellant his constitutional right to a fair trial." *Id.* at 135 (Mansfield, J., concurring). Judge Keasler concurred but asserted that the error was fundamental because it violated appellant's right to an impartial judge. *Id.* at 138 (Keasler, J., concurring). By contrast, the dissenting judges suggested that there is no need to decide whether an error is fundamental, arguing "that defendant's right to effective assistance of counsel obviates the need in many situations for the courts to exercise whatever power they have to rely on fundamental error." 43A George A. Dix, et al., *Texas Practice Series: Criminal Practice & Procedure,* § 53:135. The dissent continued, "If a contention not raised in the trial court has such clear merit and is so closely tied to the defendant's right to an accurate

judgment calls that the right in question is so important that any alleged violation of that right should never escape appellate review. *See* 43A George A. Dix, et al., *Texas Practice Series: Criminal Practice & Procedure*, § 53:135 (suggesting that "[a] right should be held to be fundamental only if, balancing all the relevant considerations, recognizing it when raised for the first time on appeal sufficiently serves important enough interests to outweigh the cost paid by dispensing with the need for a trial court objection"). While there is no settled definition of fundamental error, it may be observed that many of the errors which have been declared to be fundamental threaten a right which is essential to the proper functioning of a fair and impartial trial. *See Marin*, 851 S.W.2d at 278 ("Some rights are widely considered so fundamental to the proper functioning of our adjudicatory process as to enjoy special protection in the system.").

As the Court of Criminal Appeals has described it,

an essential ingredient of a fair and impartial adversarial proceeding, including a hearing on punishment, is that the ultimate conclusion of the fact-finder be a determination of issues tendered by pleadings giving adequate notice, raised by evidence properly admitted, upon an opportunity for defendant to confront adverse witnesses and be heard by an impartial fact-finder under fair procedures provided by law, including some showing of the basis of that conclusion.

outcome, defense counsel's failure to raise it constitutes ineffective assistance of counsel tainting the conviction." *Id.* (analyzing *Blue*, 41 S.W.3d at 140 (Keller, J., dissenting)). In *Unkart v. State*, the Court of Criminal Appeals held that "the *Blue* decision has no precedential value [but that t]he opinions in the *Blue* case may nevertheless be considered for any persuasive value they might have, in the same way as any other opinion that does not command a majority of this Court, such as a concurring opinion." *Unkart v. State*, 400 S.W.3d 94, 101 (Tex. Crim. App. 2013).

*Rose v. State*, 752 S.W.2d 529, 536 (Tex. Crim. App. 1987), *abrogated on other grounds by Karenev v. State*, 281 S.W.3d 428 (Tex. Crim. App. 2009). Once those elements are present, then the details of the trial may—and most certainly will—vary.[18]

The Court of Criminal Appeals has also noted that "the search for truth is an integral part of the adversary process, [yet] other equally prominent features characterize our system." *Morrison v. State*, 845 S.W.2d 882, 884 (Tex. Crim. App. 1992). The Court of Criminal Appeals continued, "The adversary theory as it has prevailed for the past 200 years maintains that the devotion of the participants, judge, juror and advocate, each devoted to a single function, leads to the fairest and most efficient resolution of the dispute." *Id*. at 885. And we noted in *Woodruff*,

> The fundamental justification for the sixth amendment right to counsel is the presumed inability of a defendant to make informed choices about the preparation and conduct of his defense. Free two-way communication between client and attorney is essential if the professional assistance guaranteed by the sixth amendment is to be meaningful. The purpose of the attorney-client privilege is inextricably linked to the very integrity and accuracy of the fact-finding process itself. Even guilty individuals are entitled to be advised of strategies for their defense. *In order for the adversary system to function properly*, *any advice received as a result of a defendant's disclosure to counsel must be insulated from the government.*

*Woodruff*, 330 S.W.3d at 724 (quoting *United States v. Levy*, 577 F.2d 200, 209 (3rd Cir. 1978)) (emphasis added). Finally, the right to the appointment of counsel is chief among those "fundamental rights, safeguarded by the first eight amendments against federal action [which are] also safeguarded against state action by the due process clause of the Fourteenth Amendment." *Gideon*, 372 U.S. at 343.

---

[18]Because there was no waiver in writing or on the record in open court in this case, we do not attempt to distinguish between non-waivable and waivable-only rights.

28

The State's purposeful intrusion into the defendant's attorney-client relationship threatens this fundamental requirement of an adversarial system designed to protect "[due] process and individual rights" that are "intrinsic to the adversary process due largely to a general distrust of government power." *Marin*, 851 S.W.2d at 278; *Morrison*, 845 S.W.2d at 884–85. Errors of this type threaten the "proper functioning of our adjudicatory process." *Marin*, 851 S.W.2d at 278. They should not escape appellate review due to procedural bar. Consequently, we find that Morrison did not forfeit her complaint that the State intruded into her attorney-client relationship in violation of the Sixth Amendment.[19]

## III. Defense Counsel Provided Ineffective Assistance to Morrison

In her second point of error, Morrison argues, "The bill trial counsel submitted a year and a half before the trial started was unnecessarily detailed[,] and its creation and submission constituted ineffective assistance of counsel." For the reasons stated below, we agree with Morrison.

### A. Standard of Review

To establish ineffective assistance of counsel, a defendant must first show that counsel's performance was deficient. *Strickland*, 466 U.S. at 687; *Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999). This requires a showing that counsel made errors so serious that counsel was not functioning as the counsel guaranteed defendants by the Sixth Amendment to the United

---

[19]Even if the State's purposeful intrusion into the defendant's attorney-client relationship is not a fundamental error, we can perceive no strategic reason why any reasonable defense counsel would fail to make that objection. Because the intrusion "circumvents and thereby dilutes the protection afforded by the right to counsel," *Moulton*, 474 U.S. at 171, any conceivable benefit from not objecting is outweighed by the damage to the right to counsel. This brings us to Morrison's second point of error.

States Constitution. *Id.* Once that first prong is established, it must be further shown that the deficient performance prejudiced the defense. *Id.* This requires a showing that counsel's errors were so serious that they deprived the defendant of a fair trial, a trial whose result is reliable. *Id.* Claims of ineffective assistance of counsel must be firmly rooted in the record, with the record itself affirmatively demonstrating the alleged ineffectiveness. *Lopez v. State*, 343 S.W.3d 137, 142–43 (Tex. Crim. App. 2011). Failure to satisfy either prong of the *Strickland* test is fatal. *Ex parte Martinez*, 195 S.W.3d 713, 730 n.14 (Tex. Crim. App. 2006). Thus, we need not examine both *Strickland* prongs if one cannot be met. *Strickland*, 466 U.S. at 697.

We indulge a strong presumption that counsel's conduct falls within the wide range of reasonable, professional assistance and that it was motivated by sound trial strategy. *See Jackson v. State*, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994). "If counsel's reasons for his conduct do not appear in the record and there is at least the possibility that the conduct could have been legitimate trial strategy, we will defer to counsel's decisions and deny relief on an ineffective assistance claim on direct appeal." *Ortiz v. State*, 93 S.W.3d 79, 88–89 (Tex. Crim. App. 2002). Rarely will a reviewing court be provided the opportunity to make its determination on direct appeal with a record capable of providing an evaluation of the merits of ineffective assistance claims. *Thompson*, 9 S.W.3d at 813. "In the majority of instances, the record on direct appeal is simply undeveloped and cannot adequately reflect" the reasoning of trial counsel. *Id.* at 813–14. Only in the rare case "in which trial counsel's ineffectiveness is apparent from the record" may the appellate court "address and dispose of the claim on direct appeal." *Lopez*, 343 S.W.3d at 143.

Yet, "[t]his measure of deference . . . must not be watered down into a disguised form of acquiescence." *Profitt v. Waldron*, 831 F.2d 1245, 1248 (5th Cir. 1987) (finding ineffective assistance where counsel failed to request medical records and relied on court-appointed competency examination when he knew client had escaped from mental institution). "Defense counsel is presumed to know the applicable law." *Davis v. State*, 413 S.W.3d 816, 833 (Tex. App.—Austin 2013, pet. ref'd) (citing *Ex parte Welch*, 981 S.W.2d 183, 185 (Tex. Crim. App. 1998)). Though individually, instances of substandard representation may not establish ineffective assistance, multiple failures can compel such a finding. *Greene v. State*, 928 S.W.2d 119 (Tex. App.—San Antonio 1996, no pet.). In all cases, the "ultimate focus of inquiry must be on the fundamental fairness of the proceeding." *Ex parte Martinez*, 330 S.W.3d 891, 801 (Tex. Crim. App. 2011) (quoting *Strickland*, 455 U.S. at 696).

## B. Defense Counsel's Performance Was Deficient

### 1. Exposure of Privileged Attorney Work Product

As noted, the billing records themselves constituted attorney work product. *See Nat'l Lloyds Ins. Co.*, 532 S.W.3d at 803; *Skinner v. State*, 956 S.W.2d 532, 538–39 (Tex. Crim. App. 1997). Given the extraordinary detail contained in the records, no aspect of Morrison's defense strategy or activity was protected from the State. Accordingly, we can discern no strategic reason why defense counsel would disclose such detailed information in his billing records.[20]

---

[20]It is true that Article 26.05 requires that attorney fee requests be itemized, but it does not require disclosure of confidential client communications or attorney defense strategy. We can discern no strategic reason why an attorney would disclose such detail in a request for payment.

## 2.       Exposure of Attorney-Client Privileged Information

Defense counsel's billing records also contain confidential communications with Morrison which are clearly covered by the attorney-client privilege.  Only Morrison had the authority to waive that privilege, not defense counsel.  *See Carmona v. State*, 941 S.W.2d 949, 956 (Tex. Crim. App. 1997) (Baird, J., concurring) ("only the client, or an attorney acting with the client's consent, may waive the attorney-client privilege [and] Texas law does not authorize attorneys to unilaterally waive the attorney-client privilege for their clients; only the client may relinquish the privilege").  There is no indication that Morrison authorized waiver of the privilege by defense counsel.  In fact, there is no indication or reason to believe that Morrison ever saw defense counsel's billing records before they were submitted for payment.

Moreover, the attorney-client privilege survives the client's death and may even be asserted by the client's personal representative.  *See* TEX. R. EVID. 503(c)(3).  Therefore, even if defense counsel had waited to submit his bills for payment until after completion of the trial in this case, the privilege would still have prevented disclosure of the content of his, his investigator's, or the defense psychologist's conversations with Morrison.  Furthermore, Rule 1.05 of the Texas Disciplinary Rules of Professional Conduct specifically prohibits an attorney from knowingly revealing "confidential information"—which "includes both 'privileged information' and 'unprivileged information' obtained from the client—to "(i) a person that the client has instructed is not to receive the information; or (ii) anyone else, other than the client, the client's representatives, or the members, associates, or employees of the lawyer's law firm." *See* TEX.

32

DISCIPLINARY RULES PROF'L CONDUCT R. 1.05(a), (b)(1), *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G, app. A-1 (West 2013).

It is true that appellate courts are admonished that, "[u]nder the *Strickland* standard, breach of an ethical standard does not necessarily make out a denial of the Sixth Amendment guarantee of assistance of counsel." *Nix. v. Whiteside*, 475 U.S. 157, 165 (1986). Yet, while the ethical standard in Rule 1.05 "does not necessarily make out a denial of the Sixth Amendment guarantee of assistance of counsel," it is relevant to determining whether there is any strategic reason for defense counsel's actions. *Id.* Given the nature of the prohibition in both Rule 503 and Rule 1.05, we can perceive no strategic reason why—under the circumstances of this case—defense counsel would ever disclose the detailed confidential communications included in his billing records.

### 3. Failure to Attempt Remedial Measures

Furthermore, having created and exposed the information to disclosure, defense counsel failed to take any remedial measures once he learned—the week before trial—that the State had possession of the information and intended to use it against Morrison at trial. There is no indication that defense counsel requested that the billing records be filed under seal prior to and pending trial, moved to seal the records once it became known that the State possessed them and was intending to use them at trial, filed a motion in limine or a motion to exclude the records and any information obtained from the records, or even objected to the State's use of those billing records when the State began referring to information contained in them at trial. Although there is no indication Morrison waived her attorney-client privilege, defense counsel failed to assert that privilege when he learned that the State had possession of the records or when the State actually used them at trial.

In addition, defense counsel did not ask the trial court to instruct the State to return all copies of the billing records. Nor did he ask the trial court to instruct the State's attorney to refrain from asking any further questions about the alleged letter or any other item derived from the records. He also failed to ask the trial court for an instruction to the jury to disregard the State's questions and comments about the letter or defense counsel's duty to produce it. Finally, he did not move for a mistrial based on the State's interjection of the information from the billing records. We can perceive of no strategic reason why defense counsel would have offered no attempt to stop the State from using his billing records against Morrison once he learned they were in the State's possession.

Defense counsel also failed to introduce other items of evidence available that tended to mitigate the damage caused by the State's use of his billing records. As previously mentioned, Sims wrote a letter to Morrison's parents claiming that it was all his fault and that Morrison had nothing to do with the murder. In addition, at the time of his arrest in Oklahoma, Sims told the arresting officer that he was solely responsible for Annie's murder.[21] Nevertheless, defense counsel did not attempt to offer Sims' letter, and the oral statement was not admitted because Morrison's counsel failed to assert the well-known hearsay exception available for an admission against interest. Defense counsel's failure is especially troubling considering that the trial court rather pointedly asked Morrison's counsel if his only basis for urging admission of the statement was the excited-utterance exception. Both of these items were admissible as statements against

---

[21]*See supra* note 6.

34

Sims' interest.[22]  We can perceive no strategic reason why defense counsel would not attempt to offer one or both items for the jury's consideration, especially after the State had speculated before the jury that Morrison had written a letter admitting her involvement in the murder.

## C.    Morrison Was Prejudiced by Defense Counsel's Deficient Performance

Furthermore, Morrison was prejudiced by defense counsel's deficient performance.  The Court of Criminal Appeals has held that,

> [t]o satisfy the second prong of the *Strickland* test, we do not require that the appellant show that there would have been a different result if counsel's performance had not been deficient.  The defendant must show only that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.'"

*Andrews v. State*, 159 S.W.3d 98, 102 (Tex. Crim. App. 2005) (quoting *Strickland*, 466 U.S. at 690).  In *Strickland*, the Supreme Court also held, "The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome."  *Strickland*, 466 U.S. at 694.

Defense counsel's creation of the detailed billing records allowed the State to create a false impression before the jury that Morrison had written her mother a letter admitting her involvement in the murder, that defense counsel had retrieved the letter, and that defense counsel should have produced it at trial but did not.  His subsequent failure to take protective measures to shield the

---

[22]Rule 803(24) of the Texas Rules of Evidence, provides,
> The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness:  . . . (24) ***Statement Against Interest.*** A statement that:  (A) a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it . . . expose[d] the declarant to . . . criminal liability . . . ; and (B) . . . if it is offered in a criminal case as one that tends to expose the declarant to criminal liability.

TEX. R. EVID. 803(24).

information contained in those records from the State or to protect Morrison from the State's subsequent use of those records at trial further prejudiced Morrison. Moreover, defense counsel's failure to admit one or both of Sims' statements against interest prevented the jury from hearing evidence that supported her defense of the case. Consequently, defense counsel not only disclosed information that was privileged, he also failed to introduce evidence that was exculpatory. When the State's argument that the billing records established the existence of a letter from Morrison to her mother wherein she admitted her involvement in the murder—which did not exist—is combined with the fact that the jury did not hear about Sims' oral and written admissions that he was solely responsible for the murder—which did exist—then we find that there is a reasonable probability that, but for defense counsel's deficient performance, the result would have been different.[23]

Accordingly, we find that defense counsel's representation of Morrison was deficient and that it prejudiced her at trial. Therefore, Morrison has established that she received ineffective assistance of counsel in violation of her Sixth Amendment right to counsel. Consequently, we sustain Morrison's second point of error.

## IV. The State's Intrusion Into Morrison's Attorney-Client Relationship and Defense Counsel's Ineffective Assistance of Counsel Combined to Prejudice Morrison

The prejudice Morrison experienced in this case arose from both the State's and defense counsel's actions and inactions. Defense counsel created the problem by creating billing records

---

[23]Logically, if the State acquires beneficial information from billing records by virtue of a defense attorney's deficient performance, then the defense counsel's deficient performance would also prejudice the defendant if, at trial, (1) any of "the State's evidence originated in the [intrusion]," (2) the information obtained from the records was "used in any other way to the substantial detriment of [the defendant]," or (3) the State learned details about the defendant's trial preparations from the records. *Weatherford*, 429 U.S. at 552.

36

with far too much detail in them and submitting them for payment without attempting to protect the details from disclosure. The State compounded the problem by obtaining, reviewing, and then using information from those records to suggest Morrison had written a letter admitting her involvement in the murder and that defense counsel had retrieved the letter and was refusing to produce it for trial. Defense counsel further compounded the problem by failing to object to the State's actions, by failing to attempt remedial measures, and by failing to introduce exculpatory evidence favorable to Morrison. Accordingly, the individual actions and inactions by the State and defense counsel combined to prejudice Morrison to a greater extent than either would have accomplished on their own.

## V. The Appropriate Remedy

Morrison asks that we reverse her conviction and render a judgment of acquittal in this case. Alternatively, she asks that we grant her a new trial with "a new lawyer, and the judge and prosecutor connected with the case should be disqualified." Supplemental Brief of Appellant at 12. Accordingly, we must determine what will be the appropriate remedy in this case.

### A. Standard of Review

In *State v. Frye*, the Court of Criminal Appeals held,

The Supreme Court stated that suppressing evidence and limiting cross-examination are the preferred methods for neutralizing the effects of right to counsel violations. However, the Supreme Court opined that dismissal may be warranted where a defendant suffers demonstrable prejudice, or a substantial threat thereof, and where the trial court is unable to 'identify and neutralize the taint' by other means. Because of this need to sometimes neutralize or rectify these transgressions, we are of the opinion that dismissal of an indictment, although a drastic measure only to be used in the most extraordinary of circumstances, may be necessary to adequately protect a defendant's Sixth Amendment right to counsel.

37

*State v. Frye*, 897 S.W.2d 324, 330 (Tex. Crim. App. 1995) (citing *Morrison*, 449 U.S. at 365); *see also Woodruff*, 330 S.W.3d at 724 (holding that dismissal is appropriate only when the suppression of evidence is insufficient to purge the taint of the violation).

Consequently, in determining the appropriate remedy in this case, we must determine whether we may "tailor[] relief appropriate in the circumstances to assure [Morrison] the effective assistance of counsel and a fair trial" by "denying the prosecution of the fruits of its transgression." *Morrison*, 449 U.S. at 665–66. If so, then "suppressing [the] evidence and limiting cross-examination [is] the preferred method[] for neutralizing the effects of right to counsel violations." *Frey*, 897 S.W.2d at 330. On the other hand, if it is impossible to "neutralize or rectify [the State's] transgressions, . . . dismissal of [the] indictment . . . may be necessary to adequately protect [Morrison's] Sixth Amendment right to counsel." *Id.*

### B.    Analysis

As noted, in this case, the prejudice resulting from the State's intrusion into Morrison's attorney-client relationship—and defense counsel's deficient performance in failing to prevent the State's actions or to remedy them—is that by questioning Misty about the allegedly inculpatory letter and implying that defense counsel acted inappropriately in handling that letter, the State "inject[ed] matters not in the record" and "invit[ed] the jury to speculate on what those matters were." *Berryhill*, 510 S.W.2d at 87. Because the key question before the jury was whether Morrison was involved in the murder as a party or whether she was merely a bystander to Sims' actions, and because the evidence against Morrison was circumstantial and subject to the jury's interpretation, interjection of those speculative matters into the record necessarily tainted the jury's

view and interpretation of the evidence on the key question in the case. However, we find that this prejudice can be remedied by granting Morrison a new trial and by suppressing the State's use of the billing records as well as any prior trial testimony or other evidence arising from them. This will allow a jury to decide Morrison's guilt on the evidence and not on the collateral matters arising from the billing records. In short, we can "tailor[] relief appropriate in the circumstances [in this case] to assure [Morrison] the effective assistance of counsel and a fair trial" by "denying the prosecution of the fruits of its transgression." *Morrison*, 449 U.S. at 365–66.

As we discussed above, defense counsel also submitted his and the defense investigator's second set of bills to the trial court for payment after completion of the trial.[24] Because the second set of billing records was not available for the State to review prior to trial, we find that it had no effect on the previous trial. However, the potential exists that information from those records could be used on remand. Accordingly, on remand we order that both sets of billing records and all testimony or evidence derived from either set be suppressed. Nevertheless, we make no ruling on whether the State's possession of the second set of records constitutes a continuing Sixth Amendment violation. Nor do we make any ruling about whether suppression of the second set of records would be sufficient to remedy any such violation. We leave those matters to be addressed by the trial court on remand upon proper request.

---

[24]*See supra* note 2.

## C.    Other Requests for Relief

Morrison has also asked that, on remand, we order that she receive a new attorney, a new trial judge, and a new prosecutor. The record reflects that a visiting judge was appointed to preside over the previous trial because there was a vacancy in the trial court at that time. We take judicial notice that the vacancy has now been filled. Accordingly, upon remand, a different judge will preside over the case without the necessity of any order by this Court. We, therefore, make no ruling regarding Morrison's request that a new trial judge be appointed to hear her case. We leave Morrison's requests that a new defense attorney and a new prosecutor be appointed to be addressed by the trial court on remand upon proper request.

## V.    Conclusion

For all of the foregoing reasons, we reverse the judgment of conviction and sentence and remand this case to the trial court for a new trial. We also direct the trial court to, on remand, suppress both sets of both defense counsel's and the defense investigator's billing records, together with all prior or future testimony or evidence which derives from those billing records as "fruit of the poisonous tree." We make no ruling on Morrison's request for a new trial judge, new prosecutor, and new defense counsel. We also make no ruling on whether—on remand—any Sixth Amendment violations continue to occur as a result of the State's possession of the second set of billing records and, if so, whether suppression of those records is sufficient to remedy any such violations. Because our holdings on the points of error resolved in this opinion are dispositive, we

do not address Morrison's remaining points of error.  Finally, we direct the trial court to take all other actions consistent with this opinion.


                                    Ralph K. Burgess
                                    Justice

Date Submitted:     June 20, 2018
Date Decided:       March 27, 2019

Publish